## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

**TRACY LYNN FOX,**                )
    Plaintiff                )    Civil Action No. 2:23cv00009
                 )
v.                )    **REPORT AND**
                 )    **RECOMMENDATION**
**MARTIN J. O'MALLEY,[1]**                )
**Commissioner of Social Security,**                )    By:  PAMELA MEADE SARGENT
    Defendant.                )    United States Magistrate Judge
                 )

### I. Background and Standard of Review

Plaintiff, Tracy Lynn Fox, ("Fox"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen,*

---

[1] Martin J. O'Malley, ("O'Malley"), became the Commissioner of Social Security on December 20, 2023. Pursuant to Federal Rules of Civil Procedure Rule 25(d), O'Malley should, therefore, be substituted for Kilolo Kijakazi as the defendant in this case. Pursuant to the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), no further action is required to continue this suit.

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Fox protectively filed an application for SSI[2] on November 12, 2020, alleging disability as of August 13, 2020, due to deteriorating

---

[2] Fox previously filed applications for SSI on March 26, 2009, and April 27, 2018, alleging disability beginning March 26, 2009. (R. at 171, 196.) By decisions dated April 29, 2011, and August 12, 2020, the ALJs denied her claims. (R. at 171-87, 196-207.)

Pursuant to the Fourth Circuit's opinion in *Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999), and in accordance with Social Security Acquiescence Ruling, ("A.R.") 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same … title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 142361 (Aug. 1, 1991). Pursuant to A.R. 00-1(4), the ALJ must consider prior ALJ findings using factors articulated in *Albright* such as (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period under consideration in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim. *See* A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 142361 (Aug. 1, 1991).

The ALJ in this case correctly articulated the *Albright* standard when analyzing the prior ALJ decisions. As to the April 29, 2011, decision, the ALJ stated that, due to the length of time between the two decisions, that Fox's medically determinable impairments had changed, and the current decision reflected Fox's current health problems. (R. at 39.) As to the August 12, 2020, decision, the ALJ found that Fox's reports of low energy and difficulty sleeping warranted a more restrictive residual functional capacity finding than the prior ALJ decision, and the prior ALJ's restriction of Fox to off-task behavior no longer was appropriate due to Fox's lack of overt concentration issues during encounters. (R. at 38-39.)

disc disease, neck problems, scoliosis, learning disability, anxiety, depression, stomach problems, irritable bowel syndrome, arthritis in back, surgery on left knee, carpal tunnel, trigger finger, high blood pressure, high cholesterol, insomnia, sleep apnea and short-term memory loss. (Record, ("R."), at 20, 212, 330-36, 358.) The claim was denied initially and on reconsideration. (R. at 244-51.) Fox requested a hearing before an administrative law judge, ("ALJ"). (R. at 254.) A hearing was held on August 24, 2022, at which Fox was represented by counsel. (R. at 47-72.)

By decision dated September 6, 2022, the ALJ denied Fox's claim. (R. at 20-41.) The ALJ found Fox had not engaged in substantial gainful activity since November 12, 2020, the application date. (R. at 22.) The ALJ determined Fox had severe impairments, namely degenerative disc disease, scoliosis, left knee degenerative joint disease, obesity, residual effects of carpal tunnel syndrome and trigger finger surgeries, hypertension, intellectual disorder, depression, anxiety, personality disorder and a somatic disorder, but he found Fox did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22, 24.)

The ALJ found Fox had the residual functional capacity to perform sedentary[3] work, except she could never crawl or have exposure to unprotected heights like ladders, ropes or scaffolds; she could occasionally climb ramps and stairs, balance, stoop, kneel and crouch; she could frequently handle and finger;

---

[3] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 416.967(a) (2023).

she could have occasional exposure to vibrations and other hazards, such as hazardous machinery; she could perform simple instructions and tasks that could be learned in 30 days or less, with no production rate or pace work, such as having to keep up with an assembly line that is constantly moving or in a job with strict hourly or daily quotas; and she could have no more than occasional interaction with the public or co-workers. (R. at 28.) The ALJ found Fox had no past relevant work. (R. at 39.) Based on Fox's age, education, work history, residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Fox could perform, including the jobs of a scanner, a label maker and an inspector. (R. at 40-41.) Thus, the ALJ concluded Fox was not under a disability as defined by the Act, since November 12, 2020, the day the application was filed, and she was not eligible for SSI benefits. (R. at 41.) *See* 20 C.F.R. § 416.920(g) (2023).

After the ALJ issued his decision, Fox pursued her administrative appeals, (R. at 324-26), but the Appeals Council denied her request for review. (R. at 1-6.) Fox then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2023). This case is before this court on Fox's motion for summary judgment filed July 25, 2023, and the Commissioner's motion for summary judgment filed August 24, 2023.

## II. Facts

Fox was born in 1974, (R. at 330), which classified her as a "younger person" under 20 C.F.R. § 416.963(c). She has a high school education. (R. at 29, 359.) Fox has no past relevant work, but previously worked as a self-employed

housekeeper, a lawn care worker and a babysitter. (R. at 29, 360.) Fox testified that she stopped working due to back problems, depression and anxiety. (R. at 29.) She stated that she experiences back pain every day, all day, and she lies in her bed using a heating pad at times. (R. at 29.) Fox testified that she had knee surgery a couple of years ago, but still had knee problems and took Flexeril every day. (R. at 29-30.) Fox testified that she usually used a cane due to pain, including around her house, but that she could climb a few stairs without using the cane. (R. at 30.) Fox testified that she could lift and carry only about five to eight pounds, partly due to a hiatal hernia, for which she was scheduled to undergo surgery, as well as a recurrent cyst on her left wrist that caused sharp pain at times and could not be totally removed. (R. at 30.) Regarding her alleged mental impairments, Fox testified that she saw her family doctor for depression and anxiety, and she isolated herself in her room, cried three or four times per week and worried over finances and other stressors. (R. at 30.) She stated that she tried to play games on her phone and read her Bible, but she lost focus. (R. at 30, 370.) While she is on mental health medications, Fox testified that they tend to lose their efficacy over time. (R. at 30.) Regarding her activities of daily living, Fox stated that she lived with her two adult daughters, and that her 20-year-old daughter worked, while her 27-year-old daughter had Down syndrome and was disabled. (R. at 30.) Fox testified that she cared for her older daughter by cooking for her, helping her wash her hair and taking her to the grocery store with her other daughter. (R. at 30, 371.) Fox stated that while her daughters did most of the housework, she occasionally cleaned and did laundry, but it took her all day to do so. (R. at 371.) Fox testified that she also occasionally went to church, but needed to lie down afterward due to back pain. (R. at 30.)

In rendering his decision, the ALJ reviewed records from Eric Oritt, Ph.D., a state agency psychologist; Dr. Robert McGuffin, Jr., M.D., a state agency physician; Dr. Sreeja Kadakkal, M.D., a state agency physician; Dr. Gene Godwin, M.D., a state agency physician; Dr. Eric Eddy, M.D., consultative medical examiner; Rebecca O'Quinn, N.P., a consultative medical examiner; Wade Smith, M.S., and David Dietrich, Ph.D., consultative psychological examiners; B. Wayne Lanthorn, Ph.D., a consultative psychological examiner; Wellmont Medical Associates; Lonesome Pine Hospital; Commonwealth Catholic Charities; Ballad Health Medical Associates; and Norton Community Hospital.

On October 1, 2019, Fox presented to Lonesome Pine Hospital's emergency department with complaints of left hand pain. (R. at 1113.) Fox reported that she had accidentally hit her hand with a crowbar the prior day. (R. at 1113.) Fox reported moderate pain, but no other symptoms, and physical examination was unremarkable. (R. at 1113, 1115.)  X-rays were unremarkable, and Fox was told to treat her injury with ice packs. (R. at 1116.)

On November 10, 2019, Fox presented to Lonesome Pine Hospital's emergency department complaining of abdominal pain that began a few hours earlier and was accompanied by nausea, but she denied vomiting, fever, dysuria, hematuria, melena or hematochezia. (R. at 513.) Physical examination was unremarkable. (R. at 515.) Imaging and lab results were unremarkable, and Fox was diagnosed with abdominal pain secondary to a urinary tract infection, ("UTI"). (R. at 515.) She was discharged home with antibiotics. (R. at 515.)

Throughout the time period relevant to her claim, Fox treated at Wellmont Medical Associates for primary care. On December 10, 2019, Fox asked Christy R.

Swinney, N.P., ("Swinney"), a nurse practitioner and Fox's primary care provider, for a letter that would permit Fox to keep her three dogs as emotional support animals for anxiety. (R. at 773-74.) On December 27, 2019, Fox was seen by a physicians assistant at the practice for generalized muscle cramps, lower back pain radiating to her legs and numbness and tingling in her legs. (R. at 768-69.) Fox stated that she was fatigued, but she denied any other psychiatric or physiologic symptoms, and the provider did not note any abnormalities on physical examination except that Fox had a decreased range of motion, tenderness, pain and spasm in the lumbar back. (R. at 771-72.) The physicians assistant ordered an electromyography, ("EMG"), of the lower extremities and x-ray of the lumbosacral spine and asked Fox to follow up in one week. (R. at 769, 773.)

On January 6, 2020, Fox was seen at the office for chest and head congestion. (R. at 763.) There was no mention of this visit being a follow-up on the issues Fox presented with at the previous visit. (R. at 763-68.) Fox complained of fatigue, but denied arthralgias, back pain, gait problems, joint swelling and neck pain, sleep disturbances, nervousness and anxiety. (R. at 766.) Physical examination findings were unremarkable with a normal range of motion, mood, affect, speech, behavior, judgment, thought content, cognition and memory. (R. at 767.) On January 14, 2020, Fox contacted the office and requested that her trazodone dose be increased, as it was not helping with her sleep, and Swinney doubled the dose. (R. at 757-58.) On January 16, 2020, Fox saw Swinney with complaints of nasal congestion, muscle pain, bilateral foot numbness and anxiety. (R. at 753.) Fox reported fatigue, generalized body cramps, and bilateral foot numbness that radiated up the leg and was worse on the left foot, arthralgias and back pain. (R. at 753, 755.) Swinney noted on physical examination that Fox had a normal range of motion, mild tenderness to the epigastrium and was visibly

bloated. (755-56.) All other examination findings were normal. (R. at 755-56.) Swinney prescribed Lunesta, refilled Fox's Klonopin and asked Fox to follow up in three months. (R. at 753, 757.) On January 28, 2020, Fox returned to the office with continued upper respiratory complaints. (R. at 748.) Fox reported fatigue and myalgias, and on physical examination, no abnormalities were noted except for those consistent with Fox's upper respiratory complaints. (R. at 750-51.)

On February 10, 2020, Fox presented to Lonesome Pine Hospital's emergency department with concerns about foot pain after she dropped a piece of wood on her foot. (R. at 1064-65.) Imaging results were unremarkable, and Fox was able to ambulate on the foot. (R. at 1065, 1067.) Physical examination was unremarkable except for decreased range of motion, tenderness, bony tenderness and swelling present in the right foot. (R. at 1067.) Fox was discharged from the emergency department and told to follow up with her primary care physician and take ibuprofen. (R. at 1067.)

On February 17, 2020, Fox saw Swinney for smoking cessation and insomnia. (R. at 740.) Fox reported that she was not sleeping well and had not begun using Lunesta because she wanted to wean off trazodone. (R. at 740.) Fox also reported wanting to quit smoking, indicating that she currently smoked one pack per day and had unsuccessfully tried cessation in the past. (R. at 740.) Fox further reported fatigue, cough and shortness of breath, numbness, arthralgias and back pain, and she denied gait problems, joint swelling, nervousness and anxiety. (R. at 741.) Swinney prescribed nicotine and provided Fox with instructions on how to taper off trazodone and initiate Lunesta. (R. at 740, 743.) In March 2020, Fox called the office to report that nicotine was not helping with smoking cessation and requested a different medication. (R. at 738.) Swinney confirmed that Fox was

no longer taking trazodone, and prescribed Wellbutrin instead of the nicotine. (R. at 738.) On March 18, 2020, Fox requested a refill of Phenergan for nausea and two other medications for anxiety and depression. (R. at 737-38.) Swinney noted that Fox was not taking the two medications she requested to be refilled, but does not state if she refilled them or what the medications were. (R. at 737.) On April 16, 2020, Fox had a telehealth visit at the practice for dysuria and insomnia. (R. at 733.) Fox also complained of fatigue; abdominal distention, pain, diarrhea, nausea and vomiting; arthralgias and back pain; decreased concentration, dysphoric mood and sleep disturbance. (R. at 735.) She denied gait problems, joint swelling and nervousness and anxiety. (R. at 735.) At this visit, Swinney initiated Fox on Seroquel and discontinued Lunesta. (R. at 733.) Swinney referred Fox to gastroenterology for evaluation, and she noted that Fox was awaiting a CPAP mask, had stopped smoking for 25 days, and her depression symptoms were improving. (R. at 733-34.) On May 22, 2020, Fox called the office to request more Phenergan and to ask for an adjustment to her Lunesta, which she felt was not working. (R. at 732.) Swinney called in a prescription for doxepin. (R. at 731.) On July 16, 2020, Fox saw Swinney for follow up on insomnia, an allergic reaction to her CPAP mask and headaches. (R. at 727.) Fox complained of fatigue; abdominal distention, pain, diarrhea, nausea and vomiting; arthralgias and back pain; numbness; decreased concentration; dysphoric mood; and sleep disturbance. (R. at 728.) Fox reported that she had been struggling to fall asleep for the last month and a half and that Lunesta was no longer helping her sleep. (R. at 727.) A physical examination was unremarkable. (R. at 728-29.) Swinney ordered six tests to check Fox's blood sugars, cholesterol, kidney, liver, thyroid and vitamin levels. (R. at 729-30.) The results of these tests were normal except for elevated blood sugar and cholesterol levels and a high creatine level. (R. at 1367-69.) Swinney instructed Fox that she was borderline diabetic and to increase water-based fluids, initiate diet

changes and exercise, and she ordered a repeat basal metabolic panel the following week. (R. at 726.) The repeated panel showed continued elevated creatine. (R. at 1361.) Test results from October 7 and November 5, 2020, showed creatine levels that were decreased almost back to a normal range. (R. at 1356, 1359.)

On September 22, 2020, Fox saw Kim Carter, L.P.C, a licensed professional counselor at Commonwealth Catholic Charities, for a psychiatric diagnostic evaluation. (R. at 888.) Fox had one therapy session with Carter on September 29 and did not attend any more appointments. (R. at 888.) Carter noted that a similar pattern was observed in 2019 regarding keeping appointments, and there was minimal to no therapeutic progress made. (R. at 888.) At the September 22 assessment Fox reported "very bad" anger problems that cause her to hit someone or hurt her hand, and she also cries when angry. (R. at 892.) Fox reported being tense every day, having anxiety attacks out of the blue, difficulty sleeping and anger outbursts roughly one time weekly. (R. at 892.) Fox also reported that she wanted to establish counseling because her lawyer told her it would look good for her case. (R. at 892.) A mental status examination was normal, except Carter noted Fox had a flat affect and an anxious and depressed mood. (R. at 893-94.) During the September 29 appointment, Fox expressed concerns about an upcoming apartment inspection, as well as worries about her disability case, finances and car registration. (R. at 901.) Carter encouraged Fox to focus on coping skills. (R. at 901.)

On November 5, 2020, Fox saw Swinney with pertinent complaints of back pain. (R. at 719.) Fox described the pain as starting one to four weeks previously, intermittent and waxing and waning since onset. (R. at 719.) Physical examination was unremarkable. (R. at 721-22.) Fox was prescribed Keflex, her Klonopin was

refilled, and Swinney noted that Fox had borderline learning disability and borderline diabetes. (R. at 723-23.) On November 9, 2020, Swinney prescribed Rybelsus for weight loss and borderline diabetes. (R. at 718.)

On November 14, 2020, Fox presented to Lonesome Pine Hospital's emergency department with complaints of dizziness associated with a headache and nausea. (R. at 1037.) Physical examination was normal, except for lateral nystagmus after rotating the head, and Fox was discharged with a diagnosis of mild vertigo. (R. at 1038-39.)

On February 9, 2021, Swinney saw Fox via a telehealth visit with an unspecified chief complaint. (R. at 958.) Fox reported that she had been taking Ambien around midnight and would wake up around 3:00 a.m., stating that she felt her mind raced at night and that she felt depressed and anxious. (R. at 958-59.) Fox told Swinney that she would contact Catholic Charities for telehealth therapy sessions and indicated that they felt that Fox's anxiety was interfering with sleep. (R. at 958.) Fox also reported continued nausea and abdominal pain, but stated that she had not followed up on her gastroenterology appointment. (R. at 958.) Fox also reported knee pain, stating her knee had given way three times in the last month. (R. at 958.) Swinney referred Fox to an orthopedic surgeon, refilled bentyl and changed Fox's Klonopin to Valium to help her anxiety, recommending that Fox follow up in three months. (R. at 960-61.) On March 4, 2021, Fox reported that Ambien was no longer working for sleep, and Swinney instructed her to add Seroquel to Ambien and referred Fox to psychiatry. (R. at 956.) On May 11, Swinney saw Fox via a telehealth visit. (R. at 940.) Fox complained of fatigue, arthralgias, back pain, agitation, decreased concentration, dysphoric mood, sleep disturbance, nervousness and anxiety. (R. at 941-42.) Fox stated that she had not

taken Rybelsus for her borderline diabetes and weight loss because insurance would not cover the cost of the medication. (R. at 940.) Swinney prescribed Ambien continued release and medication for high cholesterol. (R. at 943.) On August 18, 2021, Fox contacted Swinney to ask for medication due to a recent Covid-19 exposure, and Swinney prescribed antibiotics and anti-nausea medications. (R. at 937-38.) On September 16, 2021, Fox contacted the office reporting back and right leg pain, and Swinney prescribed Flexeril and Mobic. (R. at 936.)

On April 2, 2021, Fox presented to Lonesome Pine Hospital's emergency department at approximately 10:00 p.m. with complaints of an ingrown toenail. (R. at 1021.) Fox reported that while her symptoms had improved with home care, she was still in pain. (R. at 1021.) The emergency department trimmed Fox's toenail and discharged Fox with an antibiotic and ibuprofen. (R. at 1023-24.)

On June 11, 2021, David Dietrich, Ph.D., L.C.P, a licensed clinical psychologist, and Wade Smith, M.S., S.P.E., a senior psychological examiner,[4] conducted a consultative psychological evaluation of Fox at the request of Disability Determination Services. (R. at 904-09.) The examiner noted that Fox was cooperative during the interview and that rapport was felt to be established and maintained during the evaluation. (R. at 904.) Fox reported that she currently was married, but separated, and did not intend on seeking a divorce due to the cost. (R. at 904.) She said that she had two daughters, one of whom worked, and one of whom had Down syndrome and was disabled. (R. at 904.) Fox stated that she

---

[4] It appears from the record that Smith conducted the evaluation, while Dietrich signed off on it.

graduated from high school at the age of 18, and she began receiving special education services in elementary school, but she had not been retained in any grades. (R. at 904-05.) Fox reported making Ds in high school and that she was suspended once due to fighting. (R. at 905.) Fox reported that her medical conditions were back pain, sciatica, knee pain, shoulder pain, hypertension, reflux disease, irritable bowel syndrome, sleep apnea, problems with fingers getting stuck and menopause. (R. at 905.) Fox produced prescription bottles for Zoloft, Wellbutrin, Klonopin, Seroquel, Ambien, Flexeril, omeprazole, pantoprazole, Bentyl, Phenergan, atenolol, Aygestin, famotidine, benzonatate and an Albuterol inhaler. (R. at 905.) Fox reported that her counseling history consisted of two visits at a Catholic Charities about two years previously, as well as two telehealth appointments about a year previously. (R. at 905.) She reported that she had not attended any other counseling treatments or psychiatric consultations and denied a history of psychiatric hospitalization. (R. at 905.)  Regarding her psychotropic medications, Fox stated that she had taken Klonopin for nine years, Zoloft and Wellbutrin for one year and Seroquel for six months. (R. at 905.) She reported having previously taken Prozac and Paxil, beginning 19 years previously after the birth of her second daughter. (R. at 905.)

On mental status examination, Fox had a slow gait, but no other psychomotor abnormalities were noted; her mood was reported as generally "down" and currently "average," and her affect was sluggish; her speech was normal; her thought content and process and perception were normal; she was fully oriented; she could spell "world" backwards, but omitted the "r"; she could complete a serial 3s task with one error in seven calculations, requiring forty-three seconds; her short-term memory was intact; her intelligence was noted as being probably in the borderline range; and her Mini Mental State Examination,

("MMSE"), score was 27/27. (R. at 905-06.) The examiner's diagnostic impressions were that Fox had somatic symptom disorder, persistent, mild; unspecified personality disorder with cluster B traits due to Fox's reports of being a "very, very impatient person" with no close friends outside of her family, and that her most recent fistfight was 3 or 4 years ago with her older sister; unspecified depressive disorder due to anhedonic, apathetic and avolitional traits, though the examiner attributed these primarily to Fox's personality disorder; and other specified anxiety disorder, no persistent concern or maladaptive response. (R. at 907.) Fox described her activities of daily living as waking up at 2:00 p.m., eating breakfast, taking her prescriptions, washing dishes, doing laundry and playing games on her phone. (R. at 906.) She stated that she sometimes napped during the day, and she cooked dinner with her younger daughter and then played on her phone until she went to bed at 11:00 p.m. (R. at 906.) Fox reported that she was able to dust, sweep, mop, wash dishes, do laundry and take out the trash, and she performed a moderate range of cooking tasks. (R. at 906.) Fox reported that she had good relationships with her family members, no close friends, and that while she worked, she typically had good relationships with her co-workers, but her supervisors were occasionally "hateful" to her. (R. at 907.) The examiner concluded by finding that Fox had a normal level of energy; her fine and gross motor skills were within normal limits; she was mildly to moderately limited in her ability to understand and remember general items and concepts, but it would be "reasonable to expect that she should be able to comprehend and follow both simple and some detailed job instructions;" her concentration and persistence appeared adequate to meet the demands of some simple and detailed work-related decisions; she showed a moderately limited ability to interact with others in an appropriate manner; she could manage her own hygiene; she did not appear to be limited in her ability to adapt to changes in the workplace, to be aware of normal

-14-

hazards or to take appropriate precaution; and her physical problems may detract from her ability to maintain attendance and meet an employment schedule. (R. at 907.)

On July 24, 2021, Dr. Eric Eddy, M.D., conducted a consultative medical examination of Fox at the direction of DDS. (R. at 910-18.) Dr. Eddy noted that Fox appeared to be a reliable historian. (R. at 910.) Fox reported having a history of joint problems for several years that resulted in bone spur removal on her left knee in 2019, carpal tunnel release in 2019, physical therapy and an MRI in 2013 reportedly showing scoliosis and degenerated discs. (R. at 910.) Fox reported current symptoms of weakness, fatigue, shortness of breath, nausea, dizziness, pain and occasional swelling and numbness in her bilateral feet. (R. at 910.) She described a constant, achy, sharp pain in the back of her head and up her spine with an average intensity of 6 out of 10, but 8 out of 10 at the time of the examination. (R. at 910.) Fox reported that walking and standing worsened her pain, while rest relieved the pain, and she described her functional limitations as sitting 10 minutes, standing 10 minutes, walking 5 steps, and lifting 5 to 7 pounds, as well as difficulty carrying objects, hearing and traveling. (R. at 910.) Fox also reported stomach problems since 2012, for which she denied surgery or physical therapy, but stated that she had an ultrasound that reportedly showed gastroesophageal reflux disease, ("GERD"). (R. at 910.) Fox described her current symptoms as including fatigue, weakness, nausea and pain, which she described as an occasional sharp pain in her stomach with a pain intensity that was 3 out of 10 during the examination, but was usually 9 out of 10. (R. at 910.) Fox reported that nothing helped relieve her pain, but lying down made it worse. (R. at 910.) Fox also reported breathing problems since 2019 that were exacerbated by smoking, and for which she used an inhaler, medication and a CPAP machine. (R. at 911.) Fox

denied a history of hospitalizations for her breathing problems and indicated that she had never received a pulmonary function test. (R. at 911.) Fox described her symptoms as shortness of breath, chest pain and fatigue, and she stated that she could walk only 20 feet before becoming short of breath. (R. at 911.) Lastly, Fox reported having depression, anxiety and learning problems, but she was unsure when these conditions began. (R. at 911.) She reported receiving prior counseling and that she currently was on medication, but she denied other treatment. (R. at 911.) Fox described her symptoms as crying spells, changes of appetite, fatigue, mood swings, lack of motivation, social anxiety, panic attacks and difficulty sleeping and concentrating, but denied suicidal thoughts or manic episodes. (R. at 911.)

On physical examination, Dr. Eddy noted that Fox had a slow, limping gate and could ambulate without an assistive device, although she came in with a cane. (R. at 913.) Dr. Eddy noted that Fox had a slightly abnormal memory, scoring 24/30 on the MMSE. (R. at 913.) Fox had 5/5 muscle strength in all areas except for left hip flexion, extension, abduction and adduction, which were 4, 4, 4 and 4+/5, respectively. (R. at 914.) Eddy found that Fox had tenderness to palpation of the lower back and left hip; she was able to button and unbutton a shirt, pick up a coin from a table, grasp a pen, write a sentence and lift, carry and handle light objects; she was unable to squat and rise from that position; she was able to rise from a sitting position without assistance; she had mild difficulty getting up and down from the exam table; she was able to walk on heels and toes with mild difficulty; tandem walking was normal; she could stand, but not hop, on either foot, bilaterally; she could dress and undress adequately well; and she was cooperative and gave good effort during the examination. (R. at 914.) Dr. Eddy found Fox had reduced range of motion in the thoracolumbar spine, the shoulders

and the hips. (R. at 915.) Dr. Eddy found that Fox could be expected to sit 60 minutes, stand 60 minutes and walk 30 minutes at a time in an eight-hour workday before requiring a break due to back and left hip pain and weakness. (R. at 917.) Dr. Eddy found that Fox required an assistive device for ambulating long distances and on uneven terrain and that she could be expected to carry 10 pounds frequently and 15 pounds occasionally, with occasional bending, stooping, crouching and squatting. (R. at 917.) Dr. Eddy found that Fox required no manipulative, communicative or environmental limitations, but that she would require visual limitations due to decreased right visual acuity. (R. at 917.)

On August 11, 2021, Dr. Sreeja Kadakkal, M.D., a state agency physician, completed a Psychiatric Review Technique form, ("PRTF"), finding that Fox was mildly limited in the ability to understand, remember or apply information and to adapt or manage herself; and moderately limited in the ability to interact with others and to concentrate, persist or maintain pace. (R. at 216-17.) Dr. Kadakkal also completed a Mental Residual Functional Capacity evaluation, finding that Fox was moderately limited in one out three areas of understanding and memory; moderately limited in four out of eight areas of concentration and persistence; and moderately limited in two out of five areas of social interaction (R. at 221-22.) Dr. Kadakkal found that Fox's limitations were due to borderline intellectual functioning, depression and panic disorder. (R. at 221-22.)  On December 22, 2021, Eric Oritt, Ph.D., a state agency psychologist, also completed a PRTF and a Mental Residual Functional Capacity evaluation that mirrored Dr. Kadakkal's findings, with the exception that Oritt found that Fox had a moderate, not mild, limitation in the area of understanding, remembering and applying information. (R. at 217, 229, 234-35.)

On August 27, 2021, Dr. Gene Godwin, M.D., a state agency physician, completed a Physical Residual Functional Capacity evaluation, finding that Fox would be limited to light work,[5] except she could never climb ladders, ropes or scaffolds and crawl; occasionally climb ramps or stairs, balance, stoop, kneel and crouch; and should avoid concentrated exposure to vibration and hazards. (R. at 219-20.) On December 27, 2021, Dr. Robert McGuffin, Jr., M.D., completed a Physical Residual Functional Capacity evaluation that mirrored Dr. Godwin's findings. (R. at 233-34.)

On September 18, 2021, Fox presented to Lonesome Pine Hospital's emergency department with a right hand injury. (R. at 1005.) She reported cutting her hand with a box cutter almost 24 hours prior, but that the cut had bled onto the bandage she had applied, so she presented to the emergency department for evaluation. (R. at 1005.) The emergency room physician noted that Fox had a 1.5-centimeter laceration on her hand, but it had already started healing and there was no need for further intervention. (R. at 1008.) Physical examination findings were unremarkable. (R. at 1007-08.) On September 24, 2021, Fox again presented to Lonesome Pine Hospital with complaints of chest pain accompanied by cough, congestion and upset stomach that had lasted for two to three days. (R. at 1000.) Physical examination and chest x-rays were unremarkable, and Fox was diagnosed with an upper respiratory infection with exacerbation of reflux and gastritis. (R. at

---

[5] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range or light work, a claimant must have the ability to do substantially all of these activities. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. § 416.967(b) (2023).

1004-05.) Fox was told to take Tums or Maalox and drink plenty of fluids. (R. at 1005.)

On November 19, 2021, Rebecca O'Quinn, N.P., a nurse practitioner, conducted a consultative examination of Fox at the request of DDS. (R. at 1686-95.) O'Quinn found that Fox was not a reliable historian. (R. at 1686.) Fox reported having degenerative disc disease and arthritis in her thoracic spine and lumbar spine for the last three years. (R. at 1686.) She reported radiculopathy to the right leg, rating her pain as a 4 out of 10. (R. at 1686.) Fox reported that standing, sitting, squatting and lying down all caused her pain to be worse and that she used a heating pad and medication for relief. (R. at 1686.) Fox attested to neck pain for the last seven years that she rated as a 4 out of 10. (R. at 1686.) When asked what made her pain better or worse, she stated that "it's just the same as my back." (R. at 1686.) Fox also reported being diagnosed with scoliosis eight years prior, which she believed to be the cause of her back pain. (R. at 1686.) Fox reported having a learning disability since she was a child, that she had poor spelling and that her daughter helped her fill out application paperwork. (R. at 1686.) Fox also reported anxiety and depression since she was 15 years old and that she had panic attacks every two to three months. (R. at 1686.) Fox also indicated daily symptoms from IBS, for which she took medication, but did not control her diet, and persistent insomnia, for which she also took medication. (R. at 1686-87.) Fox complained of short-term memory loss, but indicated that she did not have issues forgetting people, places, time or to turn off the stove, eat or bathe. (R. at 1687.) Fox noted that she had hypertension, hyperlipidemia, trigger finger and carpal tunnel but that they were well-controlled. (R. at 1687.) Lastly, Fox complained of left knee pain for the last 15 years, reported three arthroscopic surgeries, and rated her pain was a 7 out of 10 on some days. (R. at 1687.)

Fox described her activities of daily living to include cooking three times a week, cleaning twice per week, doing laundry four times per week, shopping once a week, caring for her daughter, showering, bathing and dressing herself three times per week and reading and playing games on her phone. (R. at 1688.) O'Quinn noted that Fox had a normal gait and could walk with and without an assistive device, could walk on her heels and toes without difficulty, squat, hop, could rise from a chair without difficulty and needed no help getting on the examination table, but some help getting off the table. (R. at 1689.) O'Quinn noted no abnormalities on physical examination with the exception of a positive lying left leg raise reflex, and she found that Fox's cooperation and effort were fair, that her statements were not consistent with physical signs and testing and that her statements were consistent with medical history and treatment. (R. at 1690, 1694.) O'Quinn found that Fox did not need an assistive device and that she could stand for one hour, walk an hour and sit for six hours in an eight-hour workday. (R. at 1691.) O'Quinn opined that Fox could continuously lift and carry up to 20 pounds, occasionally lift and carry 21 to 100 pounds, had no limitations on manipulative activity, could frequently climb stairs and ramps and could occasionally climb ladders and scaffolds, balance, stoop, kneel, crouch and crawl. (R. at 1691.) Lastly, O'Quinn opined that Fox could have occasional exposure to unprotected heights, but had no other environmental limitations. (R. at 1691.)

On December 20, 2021, Fox presented to Lonesome Pine Hospital's emergency department with complaints of nasal congestion, cough and sore throat that had persisted for the previous five days. (R. at 1720.) The emergency room physician noted that one of Fox's daughters had seen her primary care physician earlier that week for the same symptoms, testing negative for flu, Covid-19 and strep. (R. at 1723.) The emergency department also noted that Fox had been fully

vaccinated for Covid-19. (R. at 1720.) The emergency department discharged Fox without a full work-up, explaining that she likely had a self-limiting viral infection and to consume plenty of fluids and take over-the-counter medications for symptom relief. (R. at 1723.)

On February 19, 2022, Fox presented to Lonesome Pine Hospital's emergency department with complaints of chest pain that occurred approximately one week prior. (R. at 1712.) Fox denied any chest pain or shortness of breath at the time she presented to the emergency department. (R. at 1712.) Physical examination, x-ray imaging, electrocardiogram, ("EKG"), testing and a comprehensive metabolic panel were unremarkable. (R. at 1713-19.) Fox was encouraged to follow up with her primary care provider for a possible Holter monitor. (R. at 1715.)

On March 3, 2022, Fox saw Swinney, now at Ballad Health Medical Associates, to follow up on her last emergency room visit and depression. (R. at 1910.) Fox reported feeling worsening depression secondary to weight gain, with symptoms including racing thoughts and periods of excessive energy. (R. at 1910.) Fox reported that her other symptoms included fatigue, irritability, weight gain, arthralgias, back pain, agitation, decreased concentration, depression, dysphoric mood and sleep disturbance. (R. at 1912-13.) Physical examination findings included abdominal tenderness in the right upper quadrant, epigastric area and left upper quadrant. (R. at 1914.) The remainder of physical examination findings were unremarkable. (R. at 1913-15.) Swinney ordered a Holter monitor, which Fox began wearing on March 29, 2022, for six days, the results of which were normal, showing no abnormal heart rate or rhythm. (R. at 1696-1709, 1921.) Swinney also referred Fox to a counselor for her mental health concerns. (R. at 1910.) Also on

March 29, an ultrasound of Fox's abdomen was unremarkable, except for hepatic steatosis.[6] (R. at 1820.)

On June 3, 2022, Fox saw Swinney, with pertinent complaints of anxiety. (R. at 1926.) Fox reported fatigue, arthralgias and back pain, agitation, decreased concentration, dysphoric mood, sleep disturbance, nervousness, anxiety and mood swings. (R. at 1929.) Physical examination was unremarkable. (R. at 1930.) Swinney instructed Fox to establish care with psychiatry for her mood swings, and Fox reported that she would think about it. (R. at 1933.)

On May 9, 2022, a hepatobiliary iminodiacetic acid, ("HIDA"), scan was performed to assess liver, bile duct and gallbladder function. (R. at 1877.) Mild nausea symptoms were reported with gallbladder stimulation, but the scan was otherwise normal. (R. at 1877.)

On June 16, 2022, Fox underwent a colonoscopy and esophagogastroduodenoscopy related to her IBS symptoms. (R. at 1894-96.) Fox reported pertinent symptoms of abdominal pain that worsened after eating, diarrhea twice per day and gastroesophageal reflux. (R. at 1896-97.) The performing physician recommended that Fox take anti-acid medications, that she may need a repeat HIDA scan in the future and that she would need another coloscopy in 10 years. (R. at 1896.) On July 5, Fox followed up, stating that she was experiencing continued epigastric pain and reflux-type symptoms. (R. at 1883.) Imaging was

---

[6] Hepatic steatosis is defined as intrahepatic fat of at least five percent of liver weight. Nonalcoholic hepatic steatosis is associated with obesity, type 2 diabetes and dyslipidemia. *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4836586/#:~:text=Hepatic%20steatosis%20is%20defined%20as,of%20nonalcoholic%20fatty%20liver%20disease. (last visited March 21, 2024).

ordered, and Fox was referred to gastroenterology for studies and assessment for hiatal hernia repair. (R. at 1889.)

On August 5, 2022, Fox saw Swinney for nasal congestion, dry mouth and cough. (R. at 1937.) Swinney prescribed antibiotics and Mucinex. (R. at 1941.) On September 9, 2022, Fox saw Swinney to discuss the results of her recent scope and bravo[7] placement. (R. at 125.) Fox reported irritation in her esophagus and an increase in GERD symptoms following the scope, and Swinney adjusted her reflux medications. (R. at 125, 130.) Fox also attested that she was receiving psychiatric services from Stone Mountain Counseling Services,[8] but she stated that her depression symptoms had been increasing. (R. at 125.) Fox reported that she had not been wanting to do anything, that she laid in bed all the time with black curtains pulled, she was depressed and anxious, unable to sleep, had multiple joint pains and back pain that prevented her from doing housework without resting and that she could not work a job because she would have to stop her tasks to alleviate the pain in her back and knees. (R. at 125.) Physical examination was unremarkable. (R. at 128-29.) Swinney found that Fox exhibited symptoms of bipolar disorder and that she needed to initiate psychiatric management. (R. at 130.)

---

[7] A Bravo Test is an assessment tool generally used for patients with GERD that is not relieved by medication, and consists of a small capsule that is clipped onto the lower part of the esophagus while the patient is under anesthesia. The test is considered to be minimally invasive, and the probe is designed to fall off the esophagus after several days and pass through the digestive tract. *See* https://my.clevelandclinic.org/health/diagnostics/12042-esophagus-48-hour-bravo-esophageal-ph-test (last visited April 5, 2024).

[8] There is no evidence in the record that Fox ever treated with Stone Mountain Counseling Services.

On October 3, 2022, imaging results from Norton Community Hospital showed a small sliding hiatal hernia.[9] (R. at 160.) On October 17, x-ray imaging of the chest was unremarkable. (R. at 152.) An EKG conducted that same day showed a normal sinus rhythm. (R. at 149-50.)

On October 24, 2022, Fox saw Swinney with complaints of sinus pain lasting seven months and insomnia. (R. at 111.) Swinney suspected rebound congestion due to overuse of nasal sprays, but referred Fox to an ENT for evaluation. (R. at 111.) Fox reported fatigue, GERD, arthralgias and back pain, agitation, decreased concentration, dysphoric mood and sleep disturbance, anxiety and mood swings, but denied all other symptoms. (R. at 114.) Physical examination was unremarkable. (R. at 115.)

A November 2, 2022, x-ray of Fox's sinuses showed no worrisome abnormalities and no evidence of sinusitis. (R. at 122.) A November 7, 2022, chest x-ray showed mildly decreased lung volumes. (R. at 147.) That same day, Fox underwent a laparoscopic Heller myotomy with hiatal herniorrhaphy and toupet fundoplication. (R. at 133-46.) On November 8, 2022, Fox was discharged from the hospital following a successful hernia surgery. (R. at 138.) Fox complained of heartburn and abdominal pain, and this was considered to be a normal postoperative finding. (R. at 138.)

On November 28, 2022, Fox saw Swinney with complaints of back pain and left shoulder pain. (R. at 103.) Fox reported continued GERD and nausea despite

---

[9] Sliding hiatal hernias are the smallest and most common type of hiatal hernia. These hernias cause your stomach to slide through a small opening in the diaphragm and up into your chest. These hernias often do not require an operation or treatment. *See* https://uofmhealth.org/conditions-treatments/surgery/hiatal-hernia (last visited Apr. 9, 2024).

her recent surgery. (R. at 103.) Fox described lower back pain that was worse with movement, and left shoulder pain that radiated from shoulder blade to shoulder blade, neck and arm. (R. at 103.) Fox described her back pain as intermittent, aching and moderate. (R. at 104.) She described her shoulder pain as intermittent and aching. (R. at 104.) Swinney prescribed pain patches and Norco, and she ordered an MRI. (R. at 109.) While MyChart screenshots were submitted in lieu of the full medical record, results of the MRI conducted on January 26, 2023, showed mild degenerative changes in the spine, no specific shoulder findings, and that follow-up imaging would be needed only if indicated by clinical assessment. (R. at 93-101.)

### *III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2023). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2023).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the

Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Fox's sole argument is that the ALJ incorrectly considered the medical opinions of Dr. Eric Eddy, M.D., Rebecca O'Quinn, N.P., Dr. Sreeja Kadakkal, M.D., and Eric Oritt, Ph.D.

Fox filed her application in November 2020; thus, 20 C.F.R. § 416.920c governs how the ALJ considered the medical opinions here.[10] When making a

---

[10] 20 C.F.R. § 416.920c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. § 416.920c(a) (2023). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 416.920c(b), (c)(1)-(5) (2023) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 416.920c(b)(1) (2023).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. § 416.920c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 416.920c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant,

specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[11] *See* 20 C.F.R. § 416.920c(b)(2).

A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 416.945(a) (2023). The ALJ found Fox had the residual functional capacity to perform sedentary work, except she could never crawl or have exposure to unprotected heights like ladders, ropes or scaffolds; she could occasionally perform other postural activities, including climbing ramps and stairs, balancing, stooping, kneeling and crouching; she could frequently perform handling and fingering; she could have occasional exposure to vibrations and other hazards, such as hazardous machinery; she could perform simple instructions and tasks that could be learned in 30 days or less, with no production rate or pace work;[12] and she could have no more than occasional interaction with the public or co-workers. (R. at 28.)

In making his residual functional capacity finding, the ALJ found Fox's July 2021 consultative examination with Dr. Eddy partially persuasive. (R. at 35-36.) Fox argues that the ALJ failed to address the supportability and consistency of this opinion in his evaluation of Fox's ability to sit, stand and walk. (Plaintiff's Brief at 9-10.) In his consultative examination, Dr. Eddy opined that Fox could be

---

[11] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 416.920c(b)(3) (2023).

[12] This was defined by the ALJ as "having to keep up with an assembly line that is constantly moving, or in a job with strict daily or hourly quotas." (R. at 28.)

"expected to sit 60 minutes, stand 60 minutes, and walk 30 minutes, at a time in an 8-hour workday before requiring a break due to back and left hip pain and weakness." (R. at 35, 917.) Fox points to Dr. Eddy's findings of tenderness to palpation of the lower back; inability to squat and rise from that position; decreased range of motion in the lumbar spine, bilateral shoulders and bilateral hips; and steady, slow, limping gait, as support for Dr. Eddy's sit, stand and walk restrictions. (Plaintiff's Brief at 9-10; R. at 910-917.) The ALJ incorporated Dr. Eddy's findings, insofar as they suggested a need for "some exertional and postural limitations," but noted that "the specific sitting, standing, and walking limitations suggested by the examiner were not adequately explained, and appear inconsistent with the claimant's non-distressed general appearance during encounters with her own providers." (R. at 35.) The ALJ limited Fox to a sedentary residual functional capacity, the exertional requirements of which involve "periods of standing or walking [that] should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." Social Security Ruling, ("S.S.R."), 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983). Citing previous physical examinations of Fox with unremarkable findings, the ALJ states that "this decision does not adopt the need for extra or unusual breaks as suggested by the first consultative examiner." (R. at 35.) Specifically, the ALJ references normal physical examinations by Fox's primary care provider, Lonesome Pine Hospital's emergency department, Fox's surgeon and O'Quinn. (R. at 35.)

Fox next argues that the ALJ erred in finding O'Quinn's consultative examination partially persuasive. (Plaintiff's Brief at 10; R. at 36.) O'Quinn opined that Fox could be expected to "stand an hour in an eight-hour workday, walk an hour in an eight-hour workday, and sit six hours in an eight-hour

-29-

workday." (R. at 1691.) O'Quinn further opined that Fox could continuously lift and carry up to 20 pounds; occasionally lift and carry 21 to 100 pounds; frequently climb stairs and ramps; occasionally climb ladders and scaffolds, balance, stoop, kneel, crouch and crawl; occasionally be on unprotected heights; and had no limitations with respect to moving mechanical parts, driving or exposure to humidity, dust and odors, pulmonary irritants and extreme heat and cold. (R. at 1691.) The ALJ found that O'Quinn's sitting restrictions were supported by her observation that Fox appeared to be in no acute distress and had negative straight leg tests when seated. (R. at 36, 1689-90.) The ALJ further found that the suggested standing and walking limitations were not fully supported, based on Fox's normal gait with and without an assistive device, as well as her ability to walk on heels and toes and perform a full squat, as well as a normal standing stance and Romberg standing. (R. at 36, 1689-90.) The ALJ then stated that, based on the record, greater lifting and carrying limitations were warranted based on Fox's history of combined musculoskeletal impairments and history of hand surgeries. (R. at 36.) Moreover, while Fox argues that Dr. Robert McGuffin, a state agency physician, stated that O'Quinn's "[o]pinion is supported and consistent with sources exam along with accumulated medical evidence," the ALJ found Dr. McGuffin's opinion only partially persuasive because he proposed that Fox be limited to light work when the ALJ found that a sedentary work restriction was required. (Plaintiff's Brief at 10; R. at 34-35.)

Fox argues that Dr. Eddy and O'Quinn's standing and walking restrictions were consistent and that the ALJ did not adequately discuss the consistencies between these two examinations. (Plaintiff's Brief at 10.) Fox further argues that "[i]n rejecting [Dr.] Eddy's limits in standing and walking, the ALJ points to Ms. O'Quinn's findings, but fails to address the stark consistencies of limitations given

by both sources." (Plaintiff's Brief at 10.) While both sources opined to similar standing and walking restrictions, as mentioned above, the ALJ discussed why he rejected both sources' opinions on Fox's restrictions in these areas. For the reasons explained above, I find that substantial evidence supports the ALJ's consideration of the opinion evidence by Dr. Eddy and O'Quinn.

Fox also argues that the ALJ did not adequately consider the opinions of Dr. Kadakkal and Oritt, the state agency psychological consultants (Plaintiff's Brief at 10-11.) Fox references the opinions of these sources stating that, in the area of concentration and persistence, "[d]ue to borderline intellectual functioning, depression, and panic disorder, she would have difficulty carrying out detailed instructions, maintaining concentration for extended periods, and working with others without being distracted." (Plaintiff's Brief at 10; R. at 221-22, 235.) Fox argues that the ALJ's residual functional capacity does not account for these opinions related to "maintaining concentration for extended periods, inability to work with others, and the need for only repetitive tasks." (Plaintiff's Brief at 11.) While the ALJ found Dr. Kadakkal and Oritt's restrictions that Fox would have "difficulty carrying out detailed instructions, maintaining concentration for extended periods, and working with others without being distracted" was not well-quantified, he did find that Fox would be restricted to "simple instructions and tasks that [could] be learned in 30 days or less, with no production rate or pace work, defined as having to keep up with an assembly line that is constantly moving, or in a job with strict daily or hourly quotas; and [she] can have no more than occasional interaction with the public or coworkers." (R. at 28, 36-37.) Fox argues that "[t]he ALJ specifically rejects . . . Oritt's opinion related to maintaining concentration for extended periods, the inability to work with others, and the need for only repetitive tasks . . . [h]owever, the ALJ does not address the same

limitations given by Dr. Kadakkal . . . [,and] [t]his unequivocal consistency of opinions went unaddressed by the ALJ." (Plaintiff's Brief at 11.) While the ALJ must consider the supportability and consistency of medical opinions as they relate to the entire record, including the claimant's subjective complaints, he is under no obligation to discuss, specifically, that two similar medical opinions are consistent with each other. While 20 C.F.R. § 416.920c(b)(3) requires an ALJ to conduct a more extensive analysis when confronted with two medical opinions that are both equally well-supported and consistent but not the same, the ALJ is not required to do so when two sources share the same opinion. The sole difference in Oritt and Dr. Kadakkal's medical opinions is that Dr. Kadakkal found that Fox had a "mild" limitation in her ability to understand, remember and apply information, whereas Oritt found that Fox had a "moderate" limitation in this area. (R. at 217, 229.) Because the ALJ decided that the evidence supported a "moderate" limitation in this area, he found Dr. Kadakkal's opinion to be less persuasive than Oritt's. (R. at 37.)  Specifically, the ALJ pointed to Fox's prior IQ testing, current activities of daily living, conservative mental health treatment and normal mental status examinations as supporting a "moderate" limitation in Fox's ability to understand, remember and apply information. (R. at 36, 215.)

Based on this, I find substantial evidence exists to support the ALJ's evaluation of the medical opinions of Dr. Eddy, O'Quinn, Dr. Kadakkal and Oritt.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence exists in the record to support the
ALJ's consideration of the medical opinion evidence; and

2.    Substantial evidence exists in the record to support the
Commissioner's finding that Fox was not disabled under
the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Fox's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion

of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     April 10, 2024.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE